### City of Dayton, et al. v. South Covington & Cincinnati Street Railway Company.

(Decided October 16, 1917.)

## Appeal from Campbell Circuit Court.

1. Municipal Corporations—Nuisance—Police Power.—A municipality in the exercise of its police power has no authority to declare that to be 'a nuisance which is not such in fact, and it may not remove or abate a thing, after having declared it to be a nuisance, when in fact it is not a nuisance.

2. Municipal Corporations—Nuisance.—Municipalities possess no police power beyond that expressly or impliedly delegated to them by the legislature, and cities of the fourth class in Kentucky have no delegated power through their charters to declare and abate a thing upon the ground of its being a nuisance when in fact it is not one.

3. Municipal Corporations—Street Railroads—Nuisance.—A street railway company constructed its tracks upon the streets of a municipality in 1870 under a special charter passed by the legislature in 1868, giving it the authority to construct such street railway with all appurtenances, including turnouts. With the consent of the city a track was laid upon one of the streets, and from it a turnout constructed to an adjacent lot used as a barn, for storage and other purposes connected with the operation of the railway, followed by a doubling of the track and the substitution of electric for horse power, after which, with the permission of the city, an additional track was built from the new double track to the lot and parallel with the original turnout track so as to make a loop on the lot. Held that the city had no right to

declare the two tracks constituting the turnout a nuisance or the use of the lot a nuisance, and to remove the tracks and buildings on the lot because of their being a nuisance, the proof showing such things to be necessary in the operation of the street railway company.

KELLY & REGENSTEIN for appellants.

MATT HEROLD for appellee.

Opinion of the Court by Judge Thomas—Affirming.

The appellee, South Covington & Cincinnati Street Railway Company (plaintiff below), owns and operates a street railway line running from the eastern part of the city of Dayton, Kentucky, which is a city of the fourth class, on Sixth avenue in that city, and continuing through the city of Newport, crossing the Ohio river into the city of Cincinnati, Ohio.

Until the year 1900 the eastern terminus of the street railway line on Sixth avenue in the city of Dayton was at the point where that street crosses Berry street, but during that year, by ordinance duly passed, the city of Dayton gave permission to the railway company to lay its track further east on Sixth street, and upon other cross streets, bringing it back to Sixth street over Clay street at the point near where it had theretofore terminated. This extension of the track made a loop upon which the cars could be turned while also serving the public over that additional territory. The track to Berry street, which was the terminus until the year 1900, was originally constructed by the Newport & Dayton Street Railway Company, which company was incorporated by a special act of the legislature of Kentucky, approved January 25, 1868. That act, among other things, provided that the Newport & Dayton Street Railway Company, "with the consent of the city councils of Newport and Dayton, may build and run a street railway from such point as may be agreed on, in the city of Newport, to such point as shall be agreed on in Dayton; and may have single or double track, with all desired turnouts and appurtenances."

On September 18, following the passage of that act, the city of Dayton by its council passed an ordinance giving its consent to the use of its streets for the purpose of constructing a street railway thereon by the Newport & Dayton Street Railway Company, the first section of the ordinance being:

"That the right of way on the streets through the city of Dayton for the purpose of constructing and laying the track of a street railroad, and running cars thereon, be and the same is hereby granted to Geo. R. Fearons and J. M. McArthur, ———— Curry and their associates under the name and style of the Newport & Dayton Street Railroad Company, with the privilege of said company of using such motive power to their cars as they deem most practicable."

There was a proviso to that ordinance that the track should be laid with the established grade of the streets and another one that the street railway company should complete its track within two years from that date. The record is not clear as to whether the track was completed within that time on Sixth avenue on up to Berry street, where it was first laid, but be that as it may, it appears that the original incorporators of that company had some trouble in financing it or in disposing of its stock in order to raise funds for the construction of the road, and to overcome that difficulty the city of Dayton procured an amendment to its charter by special act of the legislature authorizing it to subscribe $15,000.00 of the capital stock of the street railway company, which it did, and the road was immediately constructed.

Some time between the years 1870 and 1872 the street railway company acquired a lot just north of the triangle made by the junction of Sixth avenue and Berry street in the city of Dayton upon which it constructed car barns for taking care of its animals used in pulling the cars, that being the only motor power at that time, and for the further purpose of storing thereon such necessary articles as rails, ties, etc., that it might need in the maintenance of its track, and to enable it to have access to that lot it constructed a single-track turnout from its then single track to the lot. This it evidently had a right to do, as it was manifestly necessary to the operation of its cars in conducting its business as a street railway company, and besides it was given such authority by the special charter granted by the legislature in creating it. The charter of the street railway company was afterwards amended so as to permit it to consolidate with other street railway companies or to sell and dispose of its property.

In August, 1887, the Newport & Dayton Street Railway Company, in obedience to the authority thus conferred upon it, sold and transferred its line of street

railway, including that in the city of Dayton, to the plaintiff herein, South Covington & Cincinnati Street Railway Company. After the appellee acquired the street railway line from the Newport & Dayton Street Railway Company, and on November 21, 1887, the council of the city of Dayton passed an ordinance which was accepted by the plaintiff providing among other things that the company might "reconstruct its tracks in the city of Dayton, substituting for the present single track a double track," etc. This was accordingly done, and still later, in 1892, by permission of the city duly granted by ordinance electric power was substituted for animal power.

In 1897, by a resolution duly adopted at the request of plaintiff, the city gave its permission for the construction of another parallel track at the junction of Sixth avenue and Berry street with the single track theretofore used from the beginning as a turnout to plaintiff's lot hereinbefore referred to, which turnout track was constructed and connected on the lot with the first one, constituting a short loop at that point, both tracks of which cross the triangular square made by the conjunction of streets at that place.

In 1913, the city council of the city of Dayton undertook to repair Sixth avenue by paving it with brick, and it and the street railway company worked in harmony until they arrived at that portion of the street crossed by the two turnout tracks constituting the small loop mentioned, when trouble arose in this way. The plaintiff was preparing to take up those tracks and to conform their grade to the street as it was to be after the improvements, when it was informed that the city would not permit it to relay either of the tracks constituting the small loop. This was immediately followed by the city giving the plaintiff notice that it must remove its tracks entirely and permanently from the street, which would necessarily result in disconnecting the plaintiff's lot with any of its railway tracks. Plaintiff declining to do this, the removal was undertaken by the city through certain of its officers, whereupon the plaintiff filed this suit to enjoin the city and its officers from removing either of the tracks or the barn upon the lot, and to establish its right to continue the use of the loop-tracks and the lot for street railway purposes.

The court, upon trial, sustained the plaintiff's contention, and granted the injunction prayed for, and to reverse it the city and its officers prosecute this appeal.

The city attempts to justify its right to have the turnout tracks at that point taken up and abandoned, as well as to require the barn on the lot removed, upon two grounds: First, that under an ordinance passed by the city council in 1892, and accepted by plaintiff, such right was reserved to it; and, second, that the two tracks constituting the loop in crossing the street at that point, as well as the barn on the lot, were and are nuisances, and that it had the power to require that the nuisance be abated, and if the one responsible for it should fail to abate it after reasonable notice that the city had the right to do so.

In this connection, it is insisted by the city that the railroad campany in reality had no use for the loop since it had extended its track on Sixth street and other streets so as to make a loop, and that since the substitution of electric for animal power there was no necessity for the barn upon the lot, nor did the plaintiff need it for other purposes connected with its business.

An examination of the ordinance under which the city claims the right to remove the tracks involved in this litigation demonstrates that there is no such authority conferred upon the city. In substance, the ordinance provides that in the repair or reconstruction of the streets if it is necessary the city might tear up the tracks of the street railway company, if it should decline to do so after notice to that effect, but provides that the city should relay the tracks after the repairing should be finished. We searched all of the ordinances in vain to find any authority reserved to the city to permanently remove any of the company's tracks. The provisions concerning the tracks· of the company, as well as the authority to be exercised over them by the city, as found in the ordinances passed by the city relating to the subject, apply as well to turnout tracks as to those constituting the regular line of railway, since such turnout tracks are appurtenant to and are as necessary for the operation of the street railway for the purposes for which it was created as are the main lines.

Just here we might pause to notice the contention on behalf of the city that it is not now necessary to the operation of the street railway that the company should possess the turnout in question. Such necessity, as the city con-

tends, has been eliminated by the street railway company extending its lines so as to constitute a loop in the eastern part of the city as above alluded to, and that it does not need the lot, either for barn, storage or other purposes, because it has space for such things along another branch of its line in the city of Newport.

In answer to the first contention of the city that the necessity for the loop no longer exists, it may be said that the testimony in the case refutes the contention. It is shown that the loop created by the extension of the line runs over very low land a part of its route, which, in times of high water, overflows to such an extent that cars cannot be run over it, and that the small loop in question at such times is necessary in order for plaintiff to turn its cars at that point. Furthermore, that upon public and frequently crowded occasions it becomes necessary to turn some of its cars without making the entire trip around the new loop, and that on such occasions the loop in question is necessary for turning purposes, as well as being necessary for parking cars to be used upon occasions of extraordinary and increased traffic.

Concerning the contention that the plaintiff has no further use for the lot because of its owning one in the city of Newport which supplies its needs for storage purposes, it is shown that the Newport lot is upon a different line of railroad, the franchise for which has expired by this time, and may not be acquired by the plaintiff, and in addition to that its size is not sufficient for storage purposes and is entirely too far removed from the lot in Dayton to be used in connection with the operation of the Dayton line. We therefore conclude that the record fails to show that the city was authorized, under its first contention, to molest either of the tracks constituting the small loop, or the use of the lot by plaintiff.

The city relies upon subsection 25 of section 3490 of the Kentucky Statutes, being a part of the charter of cities of the fourth class, to which the city of Dayton belongs, as furnishing the authority for its second contention, but even a casual reading of the statute will disclose that no such authority as contended for is therein conferred. It only purports to vest the city with the right to grant a right of way over its streets for the construction of railroads or street railways, and to exercise "a supervisory control over the use of same, and shall

regulate the speed of cars, signals and fare on street cars.'' Regulation and control of other public service corporations is also found in the same subsection, but nowhere in it is authority conferred for the city to do anything more than supervise and regulate such public service corporations, including street railways. There is no authority given whereby the city might destroy or wholly remove such property, conceding that the legislature would have had power to grant it. Neither is the authority to abate or destroy such property to be found in the city's right of exercising its police power. In the first place, it possesses only such police power as may be expressly or by implication delegated to it by the legislature through its charter (28 Cyc. 693), and we find no such express or implied delegation in charters of the cities of the fourth class. Moreover, the only justification for the exercise of the power to destroy or abate is that the thing sought to be destroyed or abated is in fact a nuisance and therefore detrimental to the health, morals or convenience of the public; but ''a municipality can not, however, make a thing a nuisance by merely declaring it to be such; but it is limited to such things as the common law or the statute declares to be nuisances, and perhaps those things which in their nature may be nuisances, but as to which there may be honest differences of opinion in impartial minds. A municipality cannot arbitrarily or without support of reason or fact declare that which is harmless a nuisance; nor, although empowered by law, declare what shall constitute a nuisance, nor can it declare that to be a nuisance which is not such in fact.'' 28 Cyc. 715-16.

This rule has been the uniform holding of this court, as will be seen from the cases of Boyd v. Frankfort, 117 Ky. 199; City of Versailles v. Kentucky Highland Railroad Company, 153 Ky. 83, and other cases. In the latter case, referring to the former one, in announcing the limitation upon the exercise of the police power, this court said:

''In Boyd, &c., v. Board of Councilmen of the City of Frankfort, 117 Ky. 199, we held that the city council could not by ordinance declare a thing to be a public nuisance which is not, in fact, a nuisance, and that such an ordinance, being an attempted exercise of arbitrary power on the part of the council, was invalid and unenforcible.''

Such is the uniform and consistent holding of all the courts so far as we are aware, as well as being in accord with the teachings of the text writers. Louisville v. Cumberland Telephone & Telegraph Co., 224 U. S. 649; Owensboro v. Cumberland Telephone & Telegraph Co., 230 U. S. 59; Grand Trunk & Western Railroad Company v. South Bend, 227 U. S. 558.

The cases of Commonwealth v. I. C. R. R. Co., 138 Ky. 749; New York v. Squire, 145 U. S. 191; Greenwood v. Union Freight Railroad Company, 105 U. S. 13, and New York & New England Railroad Company v. Bristol, 151 U. S. 556, relied upon by counsel for the city are not in point, for the reason that those cases are dealing with matters of regulation only, which regulating authority was undoubtedly possessed, and the only question involved in them was whether the attempted regulation was a reasonable or an unreasonable one; no question of the right to abate, remove or destroy is to be found in any of them.

In this case the right to construct such turnouts as might be necessary for the operation of the street railway was conferred upon the original corporation, Newport & Dayton Street Railway Company, by its charter enacted in 1868. Under it the city of Dayton in the same year consented for a street railway company to be constructed upon its streets and it suffered and permitted it to be so constructed with the turnout heretofore mentioned. The increased traffic over the line necessitated the doubling of the track, which was done by the city's permission. All this occurred before the adoption of the present constitution requiring franchises upon public streets to be sold at public sale to the highest bidder. The right to the franchise then was acquired as soon as the street railway was constructed with the permission of the city. This right carried with it the privilege of constructing the turnout as well as acquiring and using the lot in question. After the doubling of the track the advancement of science necessitated the substitution of electric power' for animal power, thus requiring the turnout originally consisting of a single track to be converted into a loop by the addition of another track to the turnout, and this second track was not the construction of a new turnout, but conforming the old one to modern conditions so as to meet the requirements and necessities of increased traffic and the substitution of electric for animal power. It was not therefore the

granting of an additional franchise so as to convert the city's consent given in 1897 into a mere license which it may revoke at pleasure. In short, we hold that under the facts disclosed by this record the plaintiff possesses a property right in and to the tracks constituting the loop in question and to the use of its lot in connection with the operation of its railway, of which the city may not deprive it in the manner attempted. That they are necessary as appurtenant to its railway, and cannot be declared nuisances by any arbitrary action on the part of the city.

The circuit court having so held, its judgment must be and it is affirmed.