## Chesapeake & Ohio Railway Company v. City of Bellevue.

(Decided April 21, 1931.)

62

GALVIN & TRACY and ODIS W. BERTELSMAN for appellant.

GEORGE J. HEROLD for appellee.

Opinion of the Court by Creal, Commissioner—
Affirming.

Bellevue is a city of the fourth class situated on the
Ohio river in Campbell county. The city of Newport lies
immediately to the west and south and the city of Dayton
immediately to the east.

A line of railroad owned or operated by the Chesa-
peake & Ohio Railway Company runs through the city,
and, beginning at the city limits of Newport, the general
course of the railroad through Bellevue is a little west of
north. This railroad was constructed about the year
1888. In December, 1886, the city council of Bellevue
granted to the Elizabethtown, Lexington & Big Sandy
Railroad Company a franchise to build a line of railroad
through the city, but, after leaving the then southern
limits of the city, the railroad ran through a suburb
called East Newport and through what was called the
E. C. Topie addition and the Berry addition. The right
of way through this addition was acquired by purchase
by the Construction & Building Company, and it is
alleged, and not denied, that the title is now in appellant.

The Construction Company purchased lots on both
the east and west side of what is called "Pendleton
Avenue," and the deeds describe the lots abutting on
that avenue. All of the deeds refer to a map or plat of
the addition and to Pendleton avenue, but it appears
that this plat or map is not now of record, or at least
has not been found.

The railroad consists of a double track, which
crosses Pendleton avenue diagonally. The avenue is
50 feet in width. The original level was much lower
than the desired grade line of the railroad, so a trestle
work was constructed across Pendleton avenue. This
was later filled in with earth, leaving the trestle work
intact.

In 1894, by judgment of the Campbell circuit court,
territory including East Newport and Pendleton avenue
where it is crossed by the railroad was annexed and
became a part of the city of Bellevue. Berry avenue
runs from Fairfield avenue to Sixth street, north of the
railroad, and Pendleton avenue is a continuation of
Berry avenue from Sixth street to Bonnie Leslie avenue
to the south of the railroad. These two avenues form a
continuous and straight street between extreme points
indicated. To the south of E. C. Topie and Berry addi-

tions is a comparatively new addition known as Bonnie Leslie. The railroad, as we judge from plats which are in evidence, divides the city into about equal parts territorially, but, so far as the population is concerned, 75 per cent. or more of the inhabitants live to the north of the railroad and between that and the Ohio river. Practically all of the available building lots in old Bellevue have been built up, and, if the city is to grow, the growth must be to the south and east of the railroad.

In February, 1929, the city council of Bellevue passed a resolution, which it is not necessary to set out in full, but the purpose of which was to order the Chesapeake & Ohio Railway Company to restore Pendleton avenue as nearly as practicable to its former usefulness or to place it in such condition as to make it safe for travel at the point where the fill hereinbefore referred to was made.

The company having failed to comply with the order or request of the council, the city instituted this action in equity, and in its petition alleged all the facts as hereinbefore set forth, and other facts tending to show that the only practicable way in which to restore the street would be by an underpass at the point where the fill was made, and it prayed that the railroad company be required to construct and maintain a suitable underpass below its tracks so that pedestrians and vehicles might pass over and along Pendleton avenue.

The railroad company traversed the allegation of the petition, and by amended answer pleaded and relied upon the statute of limitation as a bar to plaintiff's right to relief or recovery.

Proof was taken, and, on final hearing, the court entered judgment in which the Chesapeake & Ohio Railway Company was enjoined and commanded to construct an underpass under its tracks on Pendleton avenue and necessary approaches thereto, with a minimum clearance between the surface street and the overhead structure of 13½ feet, with not more than a 10 per cent. grade. The company was directed to begin the construction on or before the 15th day of April, 1931, and to complete same on or before the 15th day of October, 1931, and it was perpetually enjoined to maintain said underpass and approaches thereto to the outside limits of its right of way.

This case has been well and extensively briefed by counsel for the respective parties, and, in an effort to reverse the judgment of the lower court, appellant

argues seven different propositions. We shall not attempt to dispose of these questions in the order in which they are treated in the brief.

The first question to be determined is whether this strip of land known as Pendleton avenue is a dedicated street of the city of Bellevue. It is clearly established by public records that lots were sold in the Topie and Berry additions, and reference was made in the deeds to a plat; that the lots were described as fronting on Pendleton avenue, and appellant's deeds to lots adjacent to Pendleton avenue contain such references. The railroad company makes no claim of title to any portion of the 50-foot strip between the lots to the east and the west over which it has acquired its right of way, unless it is still insisting on title by adverse holding. It does not appear that the company is relying upon its plea of limitations, as that question is not raised or discussed in the brief filed by its counsel. In the light of section 2546, Ky. Statutes, and the proof in this case, a plea of limitations would be of no avail, if Pendleton avenue is a street of the city of Bellevue. Appellant's apparent abandonment of its plea of limitations might be construed as indicating, at least, a tacit concession that Pendleton avenue is a public street.

In the case of Schneider v. Jacob, 86 Ky. 101, 5 S. W. 350, 351, 9 Ky. Law Rep. 382, it is said:

"And the principle is also well settled that where the owner of land lays the same out into building lots, streets, and alleys, and exhibits a map of it, which defines the lots, streets, and alleys, though the streets and alleys are not yet actually opened, and sells the lots as bounded by such streets or alleys, this is an immediate dedication of such street or alley to the use of the purchaser and to the public."

In the recent case of Brewer v. City of Mayfield, 231 Ky. 356, 21 S. W. (2d) 436, 437, this court said:

"To effect a dedication of streets and alleys shown on a plat it is not necessary that the plat be signed and acknowledged by the owner or recorded in the county clerk's office. It is admitted that Neale, the owner, employed the county surveyor to survey and plat the land, and that pursuant to this authority he prepared and filed in his office a plat showing certain lots bordering on Robertson street, and that

Neale afterwards sold several lots bordering on said street and described them by the numbers marked on the plat. This was a dedication to the use of the purchasers and the public, even though the street and alleys were not actually opened up.''

See, also, City of Middlesboro v. Ky. Utilities Co., 237 Ky. 523, 35 S. W. (2d) 877.

In this case, the lots along Pendleton avenue were sold under deeds making reference to a map or plat and also to this street, so under the cases cited it became a dedicated street for the use of the purchasers of lots and of the public, generally: Not only so, but it seems to be conceded that Berry avenue is an established street from Fairfield avenue near the river to Sixth street, which is a few hundred feet north of the railroad fill and tracks, and that Pendleton avenue is open and has been improved with concrete paving from Bonnie Leslie avenue to a point at or near the south side of the railroad fill.

It is earnestly urged by the counsel for appellant that there is no showing that a narrow strip of land between Covert Run pike and Sixth street to the north of its fill has ever been dedicated for street purposes. In making this assertion, counsel relies on the evidence of Mr. Levi Shepler, who testified that he had made a careful examination of the records in the county clerk's office and he found nothing which he considered to be a dedication from the south end of Pendleton avenue and Covert Run pike to the intersection of Sixth and Berry streets.

Mr. Morlidge, the city engineer of Bellevue, testified that the strip of land referred to by Mr. Shepler is owned by the Spinks estate, and that in 1928 he made a plat for the owners that dedicated the street through this land; that the plat was filed as exhibit in a suit to close certain highways and to open others, and shows a dedication of Pendleton avenue between the Covert Run pike and Sixth street.

The action referred to was pending in the Campbell circuit court, and styled City of Bellevue v. Laura Spinks et al. The plat of the city of Bellevue made in 1920, and showing a street through the strip of land in question, is filed as exhibit in this case, and Mr. Morlidge testified that it is shown on the maps or plans in the suit of the city against Laura Spinks and others. He further testified that the plans referred to were

included in a report made by him to the city council, with a proposed grade for Pendleton avenue, and that the proposed grade had been established by ordinance of the city. A certified copy of his report and of the city ordinance establishing a grade line of the street are filed as exhibits with the depositions.

From the evidence in this case, it is clearly established that Pendleton avenue was dedicated as a street in East Newport; and, when the territory in which it was included was annexed to Bellevue, it became a street of that city without further action on the city's part. City of Ashland v. Cummings, 194 Ky. 645, 240 S. W. 63.

It is asserted by appellant's counsel that the need for another arterial highway west of Taylor avenue is not such as to warrant the expenditure of the sums necessary to construct an underpass, and, further, that the construction of an underpass at Pendleton avenue is impracticable. It is shown in the evidence that Taylor avenue is, at present, the only practical way for travel between the portions of the city as divided by the railroad; that practically all of the business houses and all of the churches and schools are in that part of the city north of the railroad. It is further shown that the Bonnie Leslie addition has enjoyed a very rapid growth and development, and building permits granted in that addition amount to approximately $1,000,000; 200 new homes ranging in value from $7,000 to $10,000 have been erected, and it is estimated that these support a population of 800 to 1,000. It is further shown by the evidence that, while the development of this section has been somewhat retarded by the recent and general depression in business, it will continue to develop.

The underpass on Taylor avenue is, at present, the only means of vehicular travel between the old and newer portions of the city, and it is in evidence that, if this street should, for any reason, be closed to travel, traffic would have to detour through Newport a distance of about 2 miles in going from one portion of the city to the other. The road for vehicular travel through Taylor avenue underpass is only 22 feet in width, and some of the witnesses testified to having seen traffic congestions at this point. It is further shown that the opening up of Pendleton avenue for through traffic would result in a great convenience to the public, and would stimulate the growth and development of the city to the south of the railroad.

As to the practicability of an underpass on Pendleton avenue, there is a sharp conflict between the evidence of the engineer for the city and those who testify for the railroad company. According to the evidence of the city engineer, an underpass with a clearance of over 13½ feet and with a grade not to exceed 10 per cent. can be constructed. The engineers introduced by the railroad company indicate that the clearance would necessarily be less and the grade greater than that stated by the city engineer. It appears that the difference in their evidence as to the question of the clearance arises from a difference of opinion as to the character of the overhead structure that should be made.

The evidence of the engineers for the railroad seems to contemplate what is known as a deck girder bridge, or one where the ties and rails of the railroad track rest on the top of steel girders. The engineers for the city testify that what is known as a through girder bridge would be as practical and would give greater clearance under the structure. A through girder bridge, as we gather from the evidence, is one where the ties and rails are suspended at the bottom rather than rest on top of the girders. From the evidence, we are inclined to the opinion that an underpass may be so constructed on Pendleton avenue as to provide a safe, practical, and convenient way for traffic; it further appears from the evidence that a grade crossing at the point would not only be very impractical but would be extremely dangerous.

It is asserted by counsel for appellant that the city must construct a through street up to both sides of the railroad fill before it may seek to compel the company to construct an underpass. The street to the south of the railroad, as is shown by evidence, has already been constructed practically up to the fill. To the north, two or three hundred feet of the street remain unimproved. The city evidently contemplates the completion of this street in the event the underpass is constructed. It would be futile for the city to construct the street up to the railroad fill on each side if the underpass is not to be provided, and, in the event it is provided, the street can be built in such way as to better conform to the grade of the underpass.

It is further asserted that the city has failed to prove all of the important allegations of its petition, in that it has not shown a dedication of all the street or

that the fill across it is a nuisance. What we have already said as to the question of dedication is, as we think, sufficient on that point.

But as to the other question, we are not fully persuaded that, in order to require a street crossed by a railroad to be restored to its former usefulness, it must, as a condition precedent, be alleged and established that a fill or cut made by the crossing is a nuisance. But, granting the necessity for such showing, we are prepared to say that appellee has not successfully met the burden of establishing its allegation that the embankment complained of is a nuisance.

The doctrine announced in the case of City of Dayton v. South Covington & Cincinnati Street Railway Co., 177 Ky. 202, 197 S. W. 670, L. R. A. 1918B, 476, Ann. Cas. 1918E, 229, and other authorities cited by appellant to the effect that a municipality may not by declaration make that a nuisance which in fact is not such, is unquestionably sound for, after all it is only a recognition of the self-evident truth that the inherent nature of things may not be changed by legislative fiat. To say that heat is cold would not lessen the danger of playing with fire, nor would councilmanic declaration alone increase or diminish an obstruction to a street. The city cannot lend either vice or virtue to this fill, but, from its nature as described in the evidence, the court must determine whether it is a nuisance when that question is presented.

A permanent obstruction of a street or public highway is a nuisance, and is so recognized by practically all courts. 20 R. C. L., page 399, says: "And from early times it has been recognized as a nuisance for one to obstruct or interfere with the right of the public to free and safe use of a highway for purposes of travel. . . ." In support of that proposition, cases are city from the Supreme Court of the United States and from courts of most of the states, including Lexington, etc., Railway Co v. Applegate, 8 Dana (38 Ky.) 289, 33 Am. Dec. 497; Louisville, etc., Railway Co. v. Com., 80 Ky. 143, 44 Am. Rep. 468.

This fill, from 8 to 17 feet in height, is and has, since its construction, been a continuing obstruction and barrier to public travel over and along Pendleton avenue at this point.

It is not claimed by the city that appellant is under contractual obligation to construct the underpass, so we

deem it unnecessary to give thought to that question which is argued in brief by appellant's counsel.

The first point discussed in appellant's brief is the only question remaining for consideration. It is asserted by appellant's counsel that the General Assembly has not granted to fourth-class cities the power to require a railroad company to construct an underpass such as is being demanded in this case.

We find in the statutes relating specifically to cities of the fourth class nothing, expressly or impliedly, empowering such cities' to require or compel railroad companies to construct an underpass. It is true that the city may grant to a railroad company a franchise to build its lines over and across streets, and as a condition may require that the company construct and maintain proper and safe means for public travel over, across, or under the railroad tracks, but in such cases the obligation is founded upon contract, and does not arise by virtue of a statute or of the common law. And, in determining the question presented here, resort may not be had to cases where the rights are fixed by a franchise which is a contract between the city and the company. If, in a fourth-class city, a railroad company is required by means of a viaduct, grade crossing, underpass, or like facility to restore a street crossed by its lines to its former usefulness for public travel, the obligation to do so arises out of, and is fixed by the common law or by some statute of general application.

In Paducah & Elizabethtown Railway Co. v. Commonwealth, 80 Ky. 147, it is said:

> "The restoration of highways with which railroad companies have interfered is generally regulated by statute; but where there is no statute, the common law requires that the railroad companies should restore them to such condition as will not impair their usefulness, 'for it can scarcely be supposed that the Legislature intends, in any case, to allow a railroad company needlessly and permanently to destroy a public way.' (Sec. 452, Sherman & Redfield on Negligence.)"

In 22 R. C. L. sec. 135, it is said:

> "At common law the duty rests upon a railway corporation, when it occupies or crosses a public thoroughfare with its tracks, to restore same, by

some reasonably safe and convenient means to its former condition of usefulness, and such duty is also often expressly imposed by statute or charter.''

Practically all the decisions and text-writers agree upon the common-law rule as above stated, and our attention has not been called to any decision pointing the other way. So it would appear that, in the absence of any statute, a municipality may invoke the common law in requiring a railroad company to restore streets with which it has interfered in building its lines. But in this state we have a statute relating to this subject. Section 768, Ky. Statutes, in part is as follows:

"Every company shall possess the following powers, and be subject to the following liabilities and restrictions: . . . Fifth: To construct its road upon on across any water-course, private or plank road, highway, street, lane or alley, and across any railroad or canal; but the corporation shall restore the water-course, private or plank road, highway, street, lane, alley, railroad or canal to its former condition, as near as may be. . . . ''

Courts have generally held statutes similar to that portion of section 768, hereinbefore set out, to be merely declaratory of the common law, and some of the earlier opinions in this state seem to so regard our statute, but in the more recent case of Fiscal Court v. N. C. & St. L. Ry. Co., 202 Ky. 846, 261 S. W. 617, it is indicated that the statute in question is not simply additional or cumulative in its nature, but that it deals with the whole question, and that, inasmuch as it apparently relieves railroad companies of some of the duties imposed by the common law, it is exclusive of, and unmistakably intended to supersede it. But the effect of the statute with respect to the common law is not important to a determination of this case, as under either construction the primary duty and obligation of the company is the same, and the judgment complained of only requires the company to maintain the underpass and approaches within the limits of its right of way, after it is constructed.

In a number of opinions of this court, most of which have arisen out of prosecutions for failure to maintain proper crossings or out of actions for personal injuries resulting from defective crossings, this statute has been recognized as requiring railroad companies to restore, as

nearly as may be, highways which have been interfered with by the construction or reconstruction of railroad tracks. Ill. Cent. R. Co. v. Com., 138 Ky. 742, 129 S. W. 94; Com. v. L. & N. R. Co., 109 Ky. 59, 58 S. W. 478, 22 Ky. Law Rep. 572; Louisville & N. R. Co. v. Com., 149 Ky. 459, 149 S. W. 898; Husbands v. P. & I. R. Co., 176 Ky. 290, 195 S. W. 831; Fiscal Court, Fulton County, v. N., C. & St. L. Ry. Co., supra; C., N. O. & T. P. Ry. Co. v. Dungan, 162 Ky. 36, 171 S. W. 1007, 1008; Louisville & I. R. Co. v. Speckman, 169 Ky. 385, 183 S. W. 915, and for compilation and discussion of the foregoing and other cases dealing with this statute see Louisville & N. R. Co. v. Muncey, 229 Ky. 538, 17 S. W. (2d) 422.

But in Louisville & N. R. Co. v. Hopkins County, 153 Ky. 718, 156 S. W. 379, 381, decided in 1913, Judge Miller writing the court's opinion, this court had for consideration a case in which a county highway proposed to be established crossed the right of way of the railroad company where its tracks were in a cut 22 feet deep, making it necessary to span the cut with a highway bridge, and the judgment of the lower court required the company to construct the bridge. The opinion cited authorities to the effect that under statutory authority railroad companies may be required, at their own expense to carry their tracks over a highway by means of a bridge and to construct bridges and viaducts at crossings, but, after quoting all of subsection 5 of section 768, said:

"It will be noticed that, while this statute authorizes a railroad company to construct its road upon or across any highway, it not only requires the railroad to restore said highway to its former condition, but it is expressly required to 'construct suitable road and street crossings for the passage of teams by putting down planks or other suitable material on each side of the rails, the top of which shall be at least as high as the top of the rails of such road or street.' Evidently this statute contemplates the crossing of a highway by the railroad track at a grade, and not an overhead crossing of great expense, as is required by the judgment in this case."

The court evidently did not mean to say that, where a railroad is constructed across an established highway

in such a way as to make a grade crossing impractical or impossible, the company will be relieved of the duty of restoring the highway by some other means. That it was not so intended is evidenced by the fact that in the later case of C., N. O. & T. P. Ry. Co. v. Dungan, supra, where the company in constructing its railroad across an established highway left a cut 30 feet deep at the point of intersection, Judge MILLER, in writing the court's opinion, recognized the duty of the company to restore the highway by erecting and maintaining a bridge spanning the cut, and in the course of the opinion said:

> "Under subsection 5 of section 768 of the Kentucky Statutes, it was the duty of appellant to restore the turnpike and maintain its integrity as a highway."

In the former opinion the court was dealing with a case where a newly established highway crossed a railroad, being a condemnation proceeding, and in the latter with a case where a railroad was constructed across an established highway. The distinction is so obvious as to forbid elaboration.

It was not the intention of the Legislature, in enacting this statute and giving to railroad companies the right to construct railroads over and across highways and street, that the right granted should be exercised in such a way as to utterly destroy these arteries of public traffic, but it was the intent that, in consideration of this right, the companies be charged with the duty of restoring the highway or street in such a way as to maintain their usefulness for public travel. And the duty imposed includes the doing of whatever may be necessary to effect the purpose of the statute to preserve ways of public travel, whether it be by means of viaduct, bridge, grade crossing, or underpass.

And neither the statute nor the common law is unreasonable or unjust in its exactions in this respect, for they are both based upon the just and equitable principle that the public should not be burdened with the expense of restoring a highway which has been obstructed by a railroad in effecting its purposes to its own advantage.

The same statute which gave to appellants' predecessor the right to construct its lines over a dedicated street imposed upon it the duty of restoring that street,

and this duty continues until such street loses its identity; in some of the ways recognized or provided by law.

The statute in question is one of general application, and may be invoked by a city of the fourth class in a proceeding of this character.

The evidence clearly indicates that an underpass is the only practicable way of restoring Pendleton avenue so it may be made safe and useful for public travel. The judgment of the lower court is affirmed.

Whole court sitting.